**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **KITTERY POINT PARTNERS, LLC,** | ) | **Chapter 11** |
| | ) | **Case No. 17-20316** |
| Debtor. | ) | |
| | ) | |
| **KITTERY POINT PARTNERS, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adv. Proc. 17-2065** |
| | ) | |
| **TODD ENRIGHT** | ) | |
| **& BAYVIEW LOAN SERVICING LLC,** | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT TO AVOID OBLIGATIONS AND TRANSFERS, RECOVER MONEY DAMAGES, AND FOR OTHER RELIEF**

Kittery Point Partners, LLC (the "Debtor" or "KPP"), in its capacity as debtor-in-possession in the above-captioned bankruptcy case, brings this Second Amended Complaint To Avoid Obligations And Transfers, Recover Money Damages, And For Other Relief (the "Complaint") against Todd Enright ("Enright") and Bayview Loan Servicing, LLC and its affiliated entities, including Bayview Financial Services (collectively, "Bayview").

**Jurisdiction and Venue**

1. On June 22, 2017, KPP filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Petition Date"), thereby commencing a Chapter 11 bankruptcy case before this Court.

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

3. Venue of this Chapter 11 case in this District is proper pursuant to 28 U.S.C. § 1409(a). Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409(b).

4. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), (H). (K) and (0). This adversary proceeding is a core matter over which the Bankruptcy Court may exercise jurisdiction in accordance with the provisions of the foregoing sections of Title 28 of the United States Code.

## Parties

5. KPP is a Delaware limited liability company that was created on April 21, 2005 by filing its Certificate of Formation with the Delaware Secretary of State.

6. Enright is an individual who, upon information and belief, resides in Massachusetts.

7. Upon information and belief, Bayview is a limited liability company organized under the laws of the state of Delaware with a principal place of business in Coral Gables, Florida.

## Facts

8. KPP is a product of a long and complicated relationship between James Austin, his wife, Tudor Austin (together the "Austins") and Enright, who acted as their trusted financial advisor.

9. In 2005, the Austins were planning for retirement and were seeking, among other things, to renovate certain real property located in Kittery Point, Maine (the "Property").

10. The Property had been owned by the Austin family since the 1880's.

11. Enright advised the Austins that they could defer their tax exposure as to the Property if they placed it in an entity that Enright would create for them – KPP – for a discrete period of time.

12. The purpose of KPP was to hold title to the Property during a period of renovations. The Austins were to fund the renovations, after which they would receive the Property back.

13. Enright memorialized this plan in a variety of communications with the Austins. Specifically, Enright sent the Austins an outline of the plan, and the purpose of KPP by email on July 7, 2005. **Exhibit A**. The Austins agreed to this plan and KPP was created in 2005 by Enright.

14. Unfortunately, Enright's real motivation in his 1031 proposal to the Austins was to further financial schemes orchestrated by him through his alter ego, Middlebury Equity Partners ("MEP"), Steve Gordon, an employee of Bayview Financial, L.P., and Bayview Loan Servicing, LLC and its affiliated entities, (collectively, "Bayview").

15. MEP is an entity that was controlled and owned by Enright at all relevant times. The Bankruptcy Court for the District of Vermont, determined, in a Chapter 7 proceeding for Enright, that MEP was Enright's *alter ego*.

16. MEP's business model was based upon enticing investors to enter into "participation agreements" through MEP, whereby Enright would sell participations in loans that MEP had originated or purchased. The participations were ostensibly structured so that the borrower paid MEP pursuant to the loan, and MEP would then, in theory, pay the participating investors.

17. Upon information and belief, most of the loans overseen by MEP in connection with these participation agreements either did not exist or were intentionally oversubscribed by MEP in order to fund the overall scheme.

18. In addition to oversubscribing participations, Enright, Gordon and Bayview engaged in their own financial scheme, of which KPP was a victim.

19. The financial scheme between Enright, Gordon and Bayview consisted of MEP creating loans, bundling the fictitious loans together and then selling them to Bayview through Gordon who would alter the loan-to-value or debt ratios. Bayview would then securitize the loans. Enright would receive the proceeds of the sale to Bayview, Gordon would receive commissions based on the adjusted values, and Bayview would receive the proceeds from the securitization.

20. While Enright was proposing a plan for the Property with the Austins, he, in reality, had already subjected the Property to his financial schemes with Gordon and Bayview.

21. On February 8, 2005, before Enright and the Austins had agreed to the 1031 exchange for the Property, Gordon sent Enright a letter with the subject "Offer to Acquire Whole Loans of Approximately $2,525,000.00 Bayview File #M-13592-05" (the "Offer Letter"). The Offer Letter is attached hereto as **Exhibit B**.

22. The Offer Letter offered to purchase four loans from MEP upon certain conditions and based upon certain representations by MEP. One of the loans part of the transaction was a loan from MEP to KPP. This loan was at the time, and is, fictitious.

23. Section 4 of the Offer Letters lists MEP's representations and warranties regarding the four loans to be purchased by Bayview. Enright signed the Offer Letter and returned it by facsimile to Bayview between February 8 and February 10, 2005, thereby making false representations about KPP and its loan to KPP.

24. On February 10, 2005, Laura Hartmann, on behalf of Bayview, sent Enright a Loan Sale Agreement to effectuate the transaction contemplated in the Offer Letter. **Exhibit C**. Section 3 of the Loan Sale Agreement lists MEP's "Representations, Warranties and Covenants" with

respect to the four loans to be purchased.

25. Enright signed the Loan Sale Agreement, thereby falsely representing the existence of the KPP loan, and as to the list included in section 3 and returned it by facsimile to Bayview on March 29, 2005.

26. Upon information and belief at least one of the loans Enright represented was owned by MEP did not yet exist: specifically, the loan from MEP to KPP.

27. Enright, Gordon, and Bayview knew that MEP did not have four loans to sell in connection with the transaction as of February 10, 2005, and knew that the loan to KPP did not exist.

28. On March 1, 2005, in furtherance of the scheme, Enright caused KPP to execute and deliver (a) a promissory note from KPP to Middlebury Equity Partners ("MEP") in the face amount of $600,000 (the "Note"); and (b) a mortgage on the Property to MEP as security for the Note (the "Mortgage").  True and accurate copies of the Note and the Mortgage (as filed on August 15, 2007) are attached hereto as **Exhibit D** and **Exhibit E**, respectively.

29. KPP did not exist as of March 1, 2005, nor did it own any property.

30. The Note and Mortgage were executed on behalf of KPP by one Daniel Systo, allegedly in his capacity as a duly-authorized member of KPP, although it did not legally exist. Upon information and belief, Systo was a handyman who worked for MEP and/or Enright in Vermont and New Hampshire, and was Enright's agent.

31. KPP never received any funds or other consideration from MEP or any other party in consideration for and as a result of the execution of the Note and Mortgage.

32. Despite both being dated March 1, 2005, the Note and Mortgage were both purportedly acknowledged on April 27, 2005, almost two months later.

33. On April 27, 2005, Lawrence Enright (upon information and belief, Lawrence Enright is Todd Enright's father) purported to execute an assignment of mortgage (the "**Assignment**"), assigning the Mortgage from MEP to Bayview in connection with the transaction contemplated by the Offer Letter. A true and accurate copy of the Assignment is attached hereto as **Exhibit F**.

34. The purported transfer of the Mortgage via the Assignment was not made in good faith and Bayview was not a good-faith transferee of that Mortgage. Without limiting the generality of the foregoing, as set forth below, the Assignment of the Mortgage, made on April 27, 2005, made reference to the recordation of the Mortgage on a date more than two years later, in December of 2007.

35. At the time of transfer of the Mortgage, Bayview knew or should have known that the grant of the Mortgage from KPP to MEP was void or voidable. Without limiting the generality of the foregoing, as set forth below, the Assignment of the Mortgage, made on April 27, 2005, made reference to the recordation of the Mortgage on a date more than two years later, in December of 2007.

36. At all relevant times, Enright was located in New Hampshire, Vermont or Massachusetts, Gordon and Bayview were located in Florida.

37. Although the Assignment is dated April 27, 2005, it refers to the book and page number for a version of the Mortgage which was recorded in December of 2007, more than two and one half years after the date of the purported Assignment. A true and accurate copy of the December 2007 Mortgage (the acknowledgement on this version of the Mortgage differs from the version attached hereto as Exhibit B) is attached hereto as **Exhibit G**.

38. On April 27, 2005 Enright sent Bayview documents regarding KPP and purporting to evidence the Mortgage and Note in connection with the due diligence requirements of the Offer Letter and the Loan Sale Agreement. **Exhibit H**. The Mortgage and Note were both fictitious.

39. On June 6, 2005, Enright resent some of the same documents to John Draughan, an intermediary involved in the scheme, by facsimile. **Exhibit I**.

40. At the time that the Mortgage was allegedly executed, and later acknowledged, and at the time that the Assignment was allegedly executed, KPP had no interest in the Property.

41. Upon information and belief, Bayview paid MEP and Enright $600,411.21 by wire transfer on June 13, 2005 to the MEP Fleet bank account #9420053935 for the fraudulent KPP debt package. KPP never received any of those funds.

42. Bayview purchased the fraudulent KPP debt package despite knowing that the Note and Mortgage transactions were fraudulent; or in the alternative, Bayview should have known that the Note and Mortgage transactions were fraudulent.

43. Upon information and belief, Bayview financially benefitted from the scheme when it securitized the fraudulent KPP debt package.

44. On May 26, 2005 at the urging of Enright in order to further the fraudulent scheme, but in the belief that he was engaging in a 1031 exchange, James Austin executed a quitclaim deed to the Property to KPP (the "Austin Deed"). A true and accurate copy of the Austin Deed is attached hereto as **Exhibit J**. The Austin Deed was not recorded at the time it was executed and delivered.

45. The Austins had no idea at that time that KPP had executed the Note and Mortgage in favor of MEP and never would have agreed to that course of action, had they known.

46. The Austin Deed was not recorded in the York Country Registry of Deeds until January 27, 2006.

47. The Mortgage was not recorded in the York County Registry of Deeds until August 15, 2007.

48. The Assignment was not recorded in the York County Registry of Deeds until December 10, 2007. As mentioned above, the Mortgage was re-recorded in the York County Registry of Deeds on December 10, 2007.

49. Neither Enright nor MEP ever informed the Austins that KPP had purportedly executed the Note and Mortgage in favor of MEP or that MEP had then purported to assign the Mortgage to Bayview.

50. In 2008, Bayview took steps to foreclose the Mortgage on the Property which, unsurprisingly, went into default because Enright and Systo had failed to make payments purportedly required under the Note.

51. In connection with its foreclosure of the Mortgage, Bayview retained attorney James Auddifred ("Auddifred").

52. As part of his due diligence on behalf of Bayview, Auddifred discovered, and advised Bayview of the fact that KPP did not own the Property when the Note and Mortgage were executed and he warned that "there may be a complete failure of title in the mortgage." He went on to note that this was "another convoluted Middlebury Equity Partners deal" and told Bayview that the entire transaction could be fraudulent.

53. Upon information and belief, Auddifred, when faced with a possible "complete failure of title in the mortgage", looked into making a claim under a lender's title insurance policy,

but was told that the while a commitment for such title policy had been issued, the policy itself had never been issued.

54. Notwithstanding the warnings from Auddifred, Bayview proceeded with a civil action foreclosure proceeding in the Maine Superior Court. Neither Enright nor Systo, who were in control of KPP at that time, nor any attorney or other representative of KPP appeared to contest the foreclosure. The Austins did not contest the foreclosure because they were never notified of it by Bayview or anyone else.

55. With no defense to the foreclosure action having been presented to the Superior Court, the Court issued a default judgment for foreclosure in November of 2008.

56. The Austins first learned of the Bayview foreclosure action on or about September 29, 2008, after a contractor doing work on the Property told them that Bayview had filed a notice of foreclosure in the York County Registry of Deeds.

57. Horrified by what had happened on Enright's watch, James and Tudor Austin took control of KPP in January of 2009.

58. At that time, MEP's business enterprise was collapsing, resulting in the loss of millions of dollars invested in its various "participation agreements".

59. The Austins were one of many Enright victims. They confronted Enright about the Bayview foreclosure and about Enright's other schemes.

60. Enright admitted his liability to the Austins, and sent them an accounting of amounts due on a variety of fictitious investments he had induced them into, including KPP (referred to as "Bungalo"). **Exhibit K**.

61. Meanwhile, armed with their foreclosure judgment, Bayview informed Tudor Austin that it would cause the Property to be sold at foreclosure auction if she did not cause KPP to execute a forbearance agreement, entitled the "Delinquency Repayment Agreement" ("<u>DRA</u>"). A true and accurate copy of the DRA is attached hereto as **<u>Exhibit L</u>**.

62. Faced with the loss of her family residence and under duress from Bayview, Tudor Austin executed the DRA on behalf of KPP on February 27, 2009. Bayview subsequently dismissed the foreclosure proceedings.

63. The DRA was never recorded with the York County Registry of Deeds or the Maine Secretary of State.

64. On June 24, 2010, Enright filed for Chapter 7 protection in the United States Bankruptcy Court for the District of Vermont.

65. In his bankruptcy case, Enright mailed the clerk a pleading entitled "Debtor's Concise Response To Robyn Enright's Proposed Stipulated Relief From Stay Order" in which he filed a list of "participation interests" with the Court. **<u>Exhibit M</u>**. One of the "participation interests" was "Kittery Point Partners". Thus, in 2010, Enright represented to the Court that the MEP loan was a participation with Bayview and Crestone Needle, LLC, and was "transferred in LLC Exchange" in November 2009. **<u>Ex. M, pg. 37</u>**. In reality, the "loan" had actually been sold to Bayview in 2005, furtherance of Enright's scheme with Gordon in Bayview.

66. On November 18, 2013, the Bankruptcy Court for the District of Vermont denied Enright a bankruptcy discharge.

67. The Debtor did not discover Enright's discharge denial until July 20, 2017 when it reviewed the pleadings online. Counsel for the Debtor called the Vermont Bankruptcy Court and verified that general notice had never been sent to creditors in the case.

### Count I: Objection to Claim[1]
### KPP v. Bayview

68. KPP restates and realleges, as if fully set forth herein, each and every allegation of the Complaint set forth above.

69. The Note and the Mortgage are unenforceable against KPP because, *inter alia*, KPP did not legally exist at the time of the purported execution and delivery of the Note and Mortgage. Further, no consideration was exchanged for the execution and delivery of the Note and Mortgage. As such, the Note and Mortgage are each a nullity and conveyed no rights to MEP or its assignee, Bayview.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) finding, determining and declaring that the Note and Mortgage are null and void and that Bayview holds no claims, be it secured or unsecured against, KPP, or the Property or the bankruptcy estate; (b) disallowing any claims against KPP or the Property and the bankruptcy estate asserted by Bayview or any affiliates of Bayview; and (c) granting such other relief as the Court deems just and appropriate.

### COUNT II – Fraud
### KPP v. Enright

70. KPP restates and realleges, as if fully set forth herein, each and every allegation of the Complaint set forth above.

---

[1] KPP has included this Court I in light of the opinion issued by the Law Court on March 15, 2018 and the Debtor's subsequent Motion To Alter Or Amend Judgment Pursuant to Rule 59(e) Of The Federal Rules Of Procedure And Rule 9023 Of The Bankruptcy Rules Of Procedure And Incorporated Memorandum Of Law (D.E. 49). Should the Court deny the Debtor's Motion, this complaint shall be further amended. In addition, KPP reserves all of its rights with respect to other counts of its original Complaint and Amended Complaint that were dismissed by the Court, pending the outcome of any appeals with respect to such dismissal.

71. Enright and Gordon, an employee of Bayview, knowingly made false representations of material facts to the Debtor and to the Austins, in order to induce the Austins to transfer the Property to KPP, and for KPP to mortgage the Property to MEP and to Bayview. Those false representations to the Debtor included the language in the Note, which was drafted by Enright or on Enright's behalf, indicating that KPP executed the note to MEP (Enright's *alter ego*) "FOR VALUE RECEIVED". In fact the Debtor received no value or consideration for the Note. Enright, through its *alter ego,* MEP, also made false representations in the accompanying Mortgage, which was prepared by Enright or on Enright's behalf; the Mortgage that it was being executed by KPP "in consideration of Ten and More Dollars paid to its full satisfaction by [MEP]." In fact, the Debtor received no consideration for the Mortgage. Enright made additional false representation in the Mortgage when he caused it to state that KPP owed various amounts to MEP, including the $600,000 purportedly represented by the Note. In fact, KPP owed no amounts to MEP (or Enright) because it never received any consideration from MEP in the first place.

72. Enright, Gordon and Bayview intended to defraud the Austins and the Debtor as part of a scheme to deprive them of valuable property and to create false fees and commissions.

73. Bayview made additional false representations of material facts to the Debtor regarding its rights to foreclose on the Property with knowledge of their falsity or in reckless disregard of whether they were true or false for the purpose of inducing the Debtor to transfer its interest in the Property to Bayview, and subsequently, to execute and deliver the DRA.

74. The Debtor allegedly transferred an interest in the Property by (a) entering into the Mortgage in reliance on the misrepresentations of Enright and Bayview; and (b) entering into the DRA with Bayview.

75. The Debtor justifiably relied upon the representations made by Bayview and Enright as true and acted upon them to its detriment, causing it financial damage.

76. The fraud perpetrated by Enright and Bayview is and was a continuing fraud, and has continued through the present date, in that, without limitation, Bayview continues to seek the enforcement of the Note and Mortgage.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) invalidating the Note, the Mortgage, and the DRA as induced by fraud; (b) awarding damages and punitive damages on account of such fraud; and (c) granting such other and further relief as is just and proper.

**COUNT III – Conspiracy to Violate, and Violations of 18 U.S.C. §§ 1961 – 1968(a)**
**KPP v. Enright**

77. KPP repeats and realleges, as if set forth fully herein, each and every allegation of the Complaint as set forth above.

78. Enright, Gordon and Bayview together constituted an association-in-fact, an enterprise working together to obtain fraudulent mortgages, and then securitize them for sale to the public.

79. As part of the scheme, Enright agreed to create the fictitious Note and Mortgage for the non-existent KPP, and Gordon, on behalf of Bayview, agreed to purchase the fictitious Note and Mortgage.

80. The KPP transaction was one of many entered into between Enright and Gordon, on behalf of Bayview.

81. Bayview knew that the Note and Mortgage were fraudulent, or acted in reckless disregard of the fraudulent nature of the Note and Mortgage, and proceeded with the purported Assignment anyway.

82. Bayview subsequently securitized the transaction, along with others, raising substantial profits.

83. In 2008, Gordon entered a guilty plea in connection with a criminal proceeding in Florida admitting to fraud in connection with over 2,800 mortgage transactions.

84. Bayview entered into the DRA with the Debtor with knowledge that the Note and Mortgage were fraudulent, or in reckless disregard of the fraudulent nature of the Note and Mortgage, thereby furthering the scheme perpetrated upon the Debtor.

85. Bayview has continued to assert rights under the fraudulent Note and Mortgage against the Debtor, notwithstanding knowledge of the fraudulent nature of the Note and Mortgage.

86. The scheme perpetrated on KPP and the Austins was one of a number of such schemes perpetrated upon other parties over a period of time.

87. The scheme was perpetrated using U.S. Mail and wire transmission.

88. These schemes establish a pattern of racketeering by the enterprise. The continuation of the scheme as to the Debtor is also a continuation of damages as to the Debtor.

89. Enright, Gordon and Bayview have utilized the U.S. mail, telephone and email as instruments of the above described scheme and as instruments in the continuing fraud upon the Debtor.

90. The Debtor has suffered financial harm and damage as a result of Enright and Bayview's conduct.

WHEREFORE, the Debtor respectfully requests that this Court enter an order (a) entering judgment in favor of KPP; (b) awarding KPP treble damages and attorneys' fees; and (c) granting such other and further relief as it deems just and proper.

*KPP demands a trial by jury on all counts where such relief is available.*

Dated:  March 23, 2018          /s/ George J. Marcus
                                            George J. Marcus
                                            David C. Johnson
                                            Katherine M. Krakowka

                                            MARCUS | CLEGG
                                            One Canal Plaza, Suite 600
                                            Portland, ME  04101
                                            (207) 828-8000

                                            Counsel for Kittery Point Partners, LLC

## CERTIFICATE OF SERVICE

I, Karen A. Stone, hereby certify that I am over eighteen years old and caused a true and correct copy of the foregoing document to be served electronically on the parties receiving service in this case through the Court's CM/ECF electronic filing system on March 23, 2018.

/s/Karen A. Stone
Karen A. Stone
Legal Assistant

## Mailing Information for Case 17-02065

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- George J. Marcus    bankruptcy@marcusclegg.com, G30914@notify.cincompass.com
- Jeffrey T. Piampiano    jpiampiano@dwmlaw.com, sswander@dwmlaw.com
- Andrew W. Sparks    asparks@ddlaw.com, ssullivan@ddlaw.com
- Jeffrey D. Sternklar    jeffrey@sternklarlaw.com, jdsternklar@yahoo.com