**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>Kittery Point Partners, LLC,<br><br>                 Debtor | Chapter 11<br>Case No. 17-20316 |

## ORDER DETERMINING OBJECTION TO CLAIM

On November 19, 2019, the Court conducted a consolidated evidentiary hearing on three matters: (i) Count I of the Debtor's complaint against Bayview Loan Servicing, LLC ("Bayview") in Adversary Proceeding No. 17-2065 [AP Dkt. No. 51]; (ii) the Debtor's objection to Bayview's claim [Dkt. No. 111], Bayview's response [Dkt. No. 114], and the Debtor's reply [Dkt. No. 118]; and (iii) confirmation of the Debtor's Second Amended Plan of Reorganization [Dkt. No. 154] and Bayview's objection to that plan [Dkt. No. 181]. During the hearing, the Debtor and Bayview agreed on the terms of a modified plan and they asked the Court to enter an order confirming the plan, as modified. That order has since been entered. *See* [Dkt. No. 259]. In light of the consensual resolution of the disputed confirmation issues, the Court is left to determine the claim objection in the chapter 11 case and the remainder of the Debtor's complaint in the adversary proceeding (namely, Count I, in which the Debtor asks the Court to determine that Bayview holds no claims against the Debtor, its property, or the estate, and to disallow any claims that Bayview may assert). Because both of these matters seek the same relief, this order will be entered on the docket in the chapter 11 case and on the docket in the adversary proceeding. For ease of reference, the Court will refer to Count I of the adversary proceeding and the Debtor's objection to claim in the chapter 11 case collectively as the "Objection to Claim." After the hearing on November 19, the Court entered an order permitting Bayview to

amend its proof of claim to correct the amount of prepetition interest and fees associated with the claim.  *See* [Dkt. No. 253].  The Objection to Claim relates to the proof of claim as amended [POC No. 2-2] (the "Proof of Claim").

By the Proof of Claim, Bayview asserts a claim against the Debtor's estate secured by a mortgage (the "Mortgage") on real property of the Debtor in Kittery Point, Maine (the "Property").  The Mortgage attached to the Proof of Claim reflects a transfer of certain rights from the Debtor to Middlebury Equity Partners ("MEP") in 2005 in exchange for a loan evidenced by a promissory note in the face amount of $600,000 (the "Note").  The Note and an assignment of the Mortgage from MEP to Bayview are also attached to the Proof of Claim and, together with the Mortgage, form the basis of Bayview's claim.

In the adversary proceeding, the Debtor asserts that the Note and Mortgage are unenforceable because (a) the Debtor did not exist when those documents were executed, and (b) no consideration was exchanged for the execution of the Note and Mortgage.  In the chapter 11 case, the Debtor asserts that Bayview's claim should be disallowed due to a failure of consideration—a theory the Debtor seeks to distinguish from the lack of consideration theory advanced in the adversary proceeding.  Specifically, the Debtor alleges that MEP promised to pay off Wells Fargo's prior mortgage on the Property in the amount of $550,000 and to disburse $39,835 to the Debtor in exchange for the rights the Debtor granted to MEP in the Note and the Mortgage—i.e., the right to repayment of the $600,000 loan and an interest in the Property securing that right of repayment.  The Debtor alleges that MEP could have performed these promises at any time prior to the commencement of the chapter 11 case, but never did.

To support these allegations, the Debtor points to, among other things, the following documents (all of which were admitted in evidence at the hearing):

(1) a closing statement for the loan from MEP to the Debtor showing that a disbursement of $589,835 was "To be advanced to Borrower Per Loan Agreement" [Pl. Ex. E];

(2) a different closing statement for that same loan showing that $550,000 was to be disbursed "to retire first mortgage" and that $39,835 was to be disbursed "to Borrower" [Pl. Ex. F]; and

(3) a commitment for title insurance in the amount of $600,000 for MEP and its assigns requiring discharge of the prior mortgage held by Wells Fargo [Pl. Ex. G].

Neither the Bankruptcy Code nor the Bankruptcy Rules establish particular burdens of proof for claims or claim objections. *See* Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 22 & n.2 (2000). The Rules do, however, supply an evidentiary presumption: under Rule 3001(f), a proof of claim constitutes "prima facie evidence of the validity and amount of the claim" if the proof of claim is properly filed and executed. Fed. R. Bankr. P. 3001(f). The Debtor has not identified any deficiency in the execution or filing of the Proof of Claim and has conceded that the Proof of Claim is entitled to a presumption of validity. *See* [Dkt. No. 234]. After reviewing the Proof of Claim, the Court concludes that it was executed and filed in accordance with the applicable Federal Rules of Bankruptcy Procedure. As such, the Proof of Claim constitutes prima facie evidence of the validity and amount of Bayview's claim.

The Debtor may overcome the presumptive validity of the Proof of Claim by producing "substantial evidence." *See* Juniper Dev. Grp. v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 925 (1st Cir. 1993). Substantial evidence "consists of evidentiary-quality material which, if accepted, would qualify or contradict" the rights asserted by Bayview. *See* In re Perron, 474 B.R. 310, 313 (Bankr. D. Me. 2012); *see also* In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) ("In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.").

Here, it is unnecessary to plumb the exact contours of the substantial evidence standard because regardless of how it may be defined, the standard was not met. The evidence offered by the Debtor was designed to bolster its theories that Bayview's claim is unenforceable due to a lack, or a failure, of consideration. As the Court concluded during the hearing, that line of attack—and all of its many iterations—is doubly foreclosed: first, by the Delinquency Repayment Agreement ("DRA") executed by the Debtor and Bayview in 2009 [Jt. Ex. C] and the waivers in that document explicitly acknowledging the validity of the Note, the Mortgage, and the debt; and second, by the preclusive effect of the final order in the state court action between the Debtor and Bayview concerning the validity of the Note and Mortgage [Jt. Ex. E].

These conclusions depend, in part, on the events that gave rise to the DRA and the state court litigation, which can be stitched together by resort to the parties' stipulation [Dkt. No. 243] and the evidence admitted during the November 2019 hearing. Before the Debtor acquired the Property, it was owned by James Austin. [Stip. ¶ 2.] In 2003, Mr. Austin granted a mortgage on the Property to Wells Fargo to secure a note in the amount of $550,000. *See* [Jt. Ex. B]. Later, in March 2005, Daniel Systo signed the Note and Mortgage, ostensibly on behalf of the Debtor, although the Debtor had not been formed as a legal entity and did not own the Property when the documents were signed. In April 2005, the Debtor was formed as an entity, the Note and Mortgage were acknowledged, and the Mortgage was assigned to Bayview. [Stip. ¶¶ 3-5.] The

following month, Mr. Austin transferred the Property to the Debtor. [Stip. ¶ 6.][1]

In June 2005, Bayview purchased the Note and the Mortgage from MEP for approximately $600,000. [Stip. ¶ 7.] The deed by which the Debtor acquired the Property was recorded in 2006. [Stip. ¶ 8.] The following year, the Mortgage and the assignment of the Mortgage to Bayview were also recorded. [Stip. ¶¶ 9-11.] In 2008, Bayview brought a foreclosure action against the Debtor for failure to pay amounts due under the Note and Mortgage. [Stip. ¶ 13.] Bayview obtained a default judgment due to the Debtor's failure to respond. [Stip. ¶ 14.]

At some point, the Austins became members of the Debtor, though it is not clear how that transpired. *See* [Stip. ¶ 23]. Mrs. Austin became a manager of the Debtor in January 2009, [Stip. ¶ 23], and shortly after that, the Debtor executed the DRA, *see* [Jt. Ex. C]. By doing so, the Debtor agreed:

> to the . . . authenticity and validity of [the Note and Mortgage], and to the validity of the indebtedness described within those Loan Documents. Borrower further agrees and acknowledges that there are no defenses, set-offs or counterclaims to the indebtedness of Borrower pursuant to the Loan Documents. The provisions of this Agreement are a material inducement for Servicer's agreement to forbear from immediately exercising any and all of its remedies upon Borrower's default as referred herein and for entering into this Agreement.

---

[1] The introduction of an additional character here provides context: In previous litigation between these same parties, the Maine Superior Court found that the Debtor was formed, and the Property transferred to the Debtor, at the behest of Todd Enright, an advisor to James and Tudor Austin, and the person behind MEP. *See* [Jt. Ex. D]. The court further found that the Austins were advised they could achieve a tax benefit by transferring the Property to the Debtor but were not made aware of the Note in favor of MEP. *See* id. The Debtor alleges that Daniel Systo, who signed the Note and Mortgage, is, or was, somehow affiliated with Mr. Enright. When Mr. Enright sought chapter 7 relief in Vermont, the Austins sought an extension of time to object to Mr. Enright's discharge and filed a proof of claim supported by documents and a narrative suggesting that they had engaged in more than a dozen other transactions with Mr. Enright. *See* [Vt. Bk. Case 10-10873: Dkt. No. 285 & POC No. 12]. In the adversary proceeding associated with this chapter 11 case, the Debtor sought relief against Mr. Enright, asserting that he had secured the Mortgage by defrauding the Austins and the Debtor. *See* [AP Dkt. No. 51]. The Debtor later dismissed these claims against Mr. Enright voluntarily. [AP Dkt. No. 67.] The evidence admitted at the hearing in November 2019 does not disclose even a sliver of the history between the Austins and Mr. Enright.

> Borrower releases Servicer, its subsidiaries, affiliates, agents, officers, and employees, from any and all claims, damages or liabilities of any kind existing on the date of this Agreement, which are in any way connected with the Loan, the servicing of the Loan, or events which lead up to or resulted in the Borrower entering into this Agreement. Borrower waives any rights which Borrower may have under federal or state statute or common law principle which may provide that a general release does not extend to claims which are not known to exist at the time of execution[.]

[Jt. Ex. C ¶ 14.] The DRA also included a so-called "savings clause" acknowledging that the Debtor's rights and remedies under the Mortgage would not be diminished or released by virtue of the DRA. [Jt. Ex. C ¶ 15.]

After the execution of the DRA, Bayview dismissed its foreclosure complaint against the Debtor. [Stip. ¶ 18.] The Debtor made payments on the Note for a time but later stopped and then sued Bayview in Maine Superior Court seeking a declaratory judgment that the Note and the Mortgage were invalid. *See* [Jt. Ex. D]. In 2016, the Superior Court granted summary judgment to Bayview, concluding that the DRA was valid and that the releases in it extinguished the Debtor's cause of action to invalidate the Note and Mortgage due to a lack of consideration. <u>Id</u>. The Debtor appealed that decision and filed this chapter 11 case before the appeal was decided. [Stip. ¶¶ 20-21.] After the automatic stay was lifted to permit the appeal to proceed, the Maine Supreme Judicial Court affirmed the Superior Court's judgment in favor of Bayview in 2019. *See* [Stip. ¶ 30; Jt. Ex. J].[2]

A "judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered." <u>Pisnoy v. Ahmed (In re Sonus Networks, Inc.)</u>, 499 F.3d 47, 56 (1st Cir. 2007) (citing 28 U.S.C. § 1738). As such, the preclusive effect of the Maine judgment at issue here is determined under Maine law. *See* <u>id.</u>

---

[2] At some point, the Debtor initiated a malpractice action against the lawyer who represented it during the early stages of the state court litigation. That action remained active in the Maine Superior Court as recently as December 6, 2019. *See* [Dkt. No. 233].

(determining preclusive effect of Massachusetts judgment under Massachusetts law). Under Maine law, claim preclusion prevents the same matter from being litigated more than once when: "(1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action." Macomber v. MacQuinn-Tweedie, 834 A.2d 131, 139 (Me. 2003) (quotation marks omitted).[3] As to this last inquiry, Maine courts look to the cause of action in the prior litigation, which is defined by a "transactional test" evaluating "the aggregate of connected operative facts that can be handled together conveniently for purposes of trial[.]" Wilmington Trust Co. v. Sullivan-Thorne, 81 A.3d 371, 375 (Me. 2013) (quotation marks omitted). This "nucleus of operative facts" constitutes a transaction, to which preclusive principles adhere, if the facts are sufficiently "related in time, space, origin, or motivation" and might support multiple requests for relief for "the same basic wrong[.]" *See* id. (quotation marks omitted).

In this case, each of the various the legal theories supporting the Objection to Claim are foreclosed by claim preclusion. The Debtor and Bayview were involved in the litigation in the Maine state courts and are again embroiled in litigation here. There can be no question that there is a valid final judgment in the state court action. Application of the third element of claim preclusion is only slightly less straightforward. In the litigation before the Maine Superior Court, the Debtor challenged the validity of the Note and Mortgage on the grounds that consideration was lacking at the outset of the transaction because MEP did not advance any funds in exchange

---

[3] By contrast, the separate branch of res judicata that Maine law recognizes as issue preclusion bars "the reopening in a second action of an issue of fact actually litigated and decided in an earlier case." Fed. Nat'l Mortg. Ass'n v. Deschaine, 170 A.3d 230, 236 n.5 (Me. 2017) (quotation marks omitted). Here, because the question is whether the state court action prevents relitigation of a cause of action—i.e., the Debtor's claims that the Note and Mortgage are unenforceable—the Court does not address the issue preclusion component of res judicata.

for the Note. *See* [Jt. Ex. D p. 6]. When it awarded summary judgment to Bayview, the Superior Court determined that attack was barred by the DRA. The Debtor now seeks to challenge the enforceability of the Note and Mortgage on the grounds that consideration was lacking at the outset of the transaction *and* that consideration later failed. The lack of consideration theory was actually litigated in state court and may not be relitigated here. The failure of consideration theory is also barred because it could have been litigated in state court. The Debtor asserts that it could not have litigated this question in state court because, at the time of that litigation and until the petition date, MEP could still have performed its obligation to advance funds. [Dkt. No. 118 p. 2.] This contention lacks merit. The "basic wrong" for which the Debtor sought relief in state court was the alleged failure to advance funds in exchange for the Note. With the failure of consideration theory, the Debtor seeks relief for that same "basic wrong" arising out of the same set of facts. The timing of the alleged failure is not as significant as the Debtor believes. Both theories relating to consideration allege a breach of the same term of the Note—the obligation to advance funds in exchange for the Debtor's promise of repayment—and the same conduct—a failure to advance funds, at the time of the transaction or any time thereafter. *Cf.* Sullivan-Thorne, 81 A.3d at 376 (concluding that a foreclosure claim was not barred by claim preclusion where the prior litigation alleged "a breach of a different term of the mortgage based on wholly separate conduct").

During the evidentiary hearing on the Objection to Claim, the Debtor asserted that Bayview does not qualify as a holder in due course and, as such, cannot collect on a note for which no funds were ever advanced. Bayview's status as a holder in due course was raised in the state court action, and the Superior Court determined that it was unnecessary to resolve the issue in light of the waiver contained in the DRA. [Jt. Ex. D p. 8]. In the course of the

consolidated hearing in this Court, the Debtor also claimed, for the first time, that the so-called "savings clause" clause in the DRA should permit the Debtor to press its failure of consideration claim.[4] This theory—and the Debtor's theory that the Note and Mortgage are invalid because they were executed before the Debtor was formed as a legal entity—could have been litigated in the state court action, which was squarely focused on whether the DRA barred the Debtor's efforts to contest the validity of the Note and Mortgage. *See* Beegan v. Schmidt, 451 A.2d 642, 644 (Me. 1982) (concluding that breach of contract claims could have been presented in prior suit where litigant must have known about those facts when she commenced the prior suit). The Debtor additionally argued that its various theories are somehow removed from the confines of res judicata because the state court did not determine the amount of the debt, and the Debtor is now seeking to restructure that debt in this chapter 11 case. The availability of that relief in bankruptcy does not, however, suspend the normal operation of preclusive principles, *cf.* Sullivan-Thorne, 81 A.3d at 375 ("Claim preclusion may apply even where a suit . . . seeks different relief than that sought in the first case[.]") (quotation marks omitted), and the Debtor points to no controlling authority to support its arguments to the contrary. Although the Debtor makes much of the fact that the state court did not determine the amount of the debt, and the Debtor seeks to characterize the Objection to Claim as an effort to determine the amount of the debt, the Objection to Claim is concerned entirely with the Debtor's efforts to challenge the validity and existence of the debt. If the Debtor had not already spent years litigating the validity of the Note and Mortgage, then it might have more arrows in its quiver in this chapter 11 case.

---

[4] The late advent of this argument was not the only time the sands of the Debtor's various theories shifted. In the summary judgment order issued in 2016, the Maine Superior Court found that the DRA acknowledged the principal amount of the debt and $58,372 in arrears on the Note. [Jt. Ex. D at pp. 4 & 7.] In the chapter 11 case, at a hearing in 2018, the Debtor asserted that the DRA established a debt but only for $58,372. *See* [Dkt. No. 152]. Later, the Debtor stipulated that this figure was instead the amount of the arrears owed as of February 2009. [Stip. ¶ 16.]

But neither the chapter 11 case nor the adversary proceeding give the Debtor the opportunity to relitigate matters that were, or might have been, litigated in the state court action.[5]

The evidence offered by the Debtor in support of the Objection to Claim only supports legal theories that are barred by the doctrine of claim preclusion. As such, that evidence does not constitute "substantial evidence" sufficient to rebut the presumption of prima facie validity that adheres to the Proof of Claim. From here, the analysis begins with the amount of the Proof of Claim and any challenges to the computation of that amount that do not depend on legal theories that were or could have been brought before the state court.

The Proof of Claim sets forth the following components of Bayview's claim:

| Principal | $550,045.37 |
|---|---|
| Interest Through June 22, 2017 | $217,296.81 |
| Default Interest Through June 22, 2017 | $212,989.37 |
| Escrow Advances | $8,671.06 |
| Late Charges | $2,365.41 |
| Corporate Advances: Attorney Fees, Property Inspection Fees, & Court Costs | $248,758.29 |
| Total Debt | $1,240,126.31 |

[POC No. 2-2.][6] At the hearing, the Debtor suggested that the default rate of interest specified in the Note was not commercially reasonable, and that the attorney fees included in Bayview's

---

[5] For all of the reasons set forth above, it is not appropriate to entertain any of the Debtor's legal theories that are now barred. For instance, the Court does not countenance the Debtor's effort to establish that no interest is properly due and owing, and that no legal fees are due and owing, because no money was ever advanced by MEP. This effort is yet another attempt to circumvent the preclusive effect of the state court judgment and the agreements reflected in the DRA. Chapter 11 does allow a debtor to escape some of the consequences of decisions made prior to bankruptcy. But, contrary to the Debtor's apparent belief, chapter 11 does not undo everything that took place before bankruptcy.

[6] The Proof of Claim states that the "Total Debt" is $1,237,760.90, but the components of the claim add up to $1,240,126.31. The difference between these two figures is exactly $2,365.41, the amount of the "Late Charges" set forth on the Proof of Claim. The "Total Debt" stated on the Proof of Claim apparently excludes the amount of the "Late Charges." The Debtor did not argue that the "Late Charges" should be disallowed, and the figure set forth is accorded prima facie validity. *See* Fed. R. Bankr. P. 3001(f). The "Late Charges" are therefore included in the total amount of the claim.

claim may not be reasonable. The Debtor did not offer any evidence in support of those suggestions, implying only that the default rate of interest might be a penalty and that the Court could not determine the reasonableness of the attorney fees in the absence of expert testimony.[7] The Debtor did not rebut the prima facie validity of those components of the Proof of Claim. The Objection to Claim is overruled entirely, and the claim is allowed under 11 U.S.C. § 502 in the amount of $1,240,126.31.

During the consolidated hearing, the parties asked the Court to determine the amount of Bayview's allowed secured claim under 11 U.S.C. § 506, as of November 19, 2019. *See also* [Dkt. No. 259, ¶ I(A)]. Under 11 U.S.C. § 506(b), the holder of an allowed secured claim may recover postpetition interest and reasonable postpetition fees and expenses provided for under the agreement that gave rise to the claim to the extent that the claim is secured by property with a value greater than the amount of the claim. *See* Prudential Ins. Co. of Am. v. SW Boston Hotel Venture, LLC (In re SW Boston Hotel Venture, LLC), 748 F.3d 393, 404 (1st Cir. 2014). In this matter, there has been no suggestion that the value of the Property is less than the amount of Bayview's claim. Instead, the Debtor has consistently represented that the Property is valued at more than $3.5 million. *See* [Dkt. No. 16 & 42] (representing that the Property has a cost basis of more than $3.5 million); [Dkt. No. 50] (indicating that the Property is worth between $3.65 million and $3.85 million according to a comparative market analysis); [Dkt. No. 155] (expressing a belief that the Property has a fair market value of $3,586,514). The Court construes these statements as admissions and determines that the Property is worth approximately $3.5 million for purposes of section 506(b). As such, Bayview's claim of $1,240,126.31 is "oversecured" by more than $2 million. *See* Baybank-Middlesex v. Ralar

---

[7] The Debtor did not point to any authority supporting its arguments about default interest and did not request an opportunity to submit briefing on the question.

Distribs., 69 F.3d 1200, 1202 (1st Cir. 1995) ("A creditor is oversecured when the value of its collateral exceeds the amount of its claim; postpetition interest and fees are allowable only to the extent of that oversecurity.").

As of November 19, 2019, a payoff statement for the Debtor's obligation to Bayview reflected the components of Bayview's claim as follows:

| Principal | $550,045.37 |
| Interest Through November 19, 2019 | $310,029.68 |
| Default Interest Through November 19, 2019 | $305,722.24 |
| Escrow Advances | $7,361.85 |
| Late Charges | $2,365.41 |
| Corporate Advances: Attorney Fees, Property Inspection Fees, & Court Costs | $460,008.29 |
| Total Debt | $1,635,532.84 |

[Def. Ex. 6.] The payoff statement did not include certain legal fees that Bayview incurred from October 1, 2019 to November 19, 2019. After the hearing, Bayview filed affidavits showing that, in that time period, it incurred attorney fees and expenses of $6,563.80 for its representation by Bernstein Shur and $31,236.10 for its representation by Drummond & Drummond. [Dkt. No. 255 & 256.][8]

Between the petition date and November 19, 2019, interest and default interest continued to accrue on the Debtor's obligation. Despite the Debtor's suggestions to the contrary, the parties' contractual agreements about the interest rate and the default interest rate "presumptively apply" in determinations under section 506(b) "so long as [those agreements] are enforceable under state law and equitable considerations do not dictate otherwise[.]" In re SW Boston Hotel Venture, LLC, 748 F.3d at 413. The Debtor has not identified any principles of state law or equity that override that presumption in this case. Bayview may therefore add to the allowed

---

[8] The affidavit relating to representation by Drummond & Drummond includes one charge of $90.00 for a service performed on November 20, 2019. This charge is excluded in the figure set forth above.

amount of its claim the interest and default interest that accrued between the petition date and November 19, 2019.

Between the petition date and November 19, 2019, Bayview also continued to incur legal fees and costs defending the Note and Mortgage in the state court, the chapter 11 case, and the adversary proceeding. The Note provides that Bayview may recover costs and reasonable legal fees incurred in enforcing or defending the Note.[9] The Debtor has suggested that Bayview's postpetition legal fees are, in some undefined respect, unreasonable. The Debtor has not, however, challenged any tasks performed by Bayview's counsel, the time spent by counsel on any tasks, counsel's hourly rates, or any other specific aspect of Bayview's postpetition legal fees. The Court has reviewed the billing details submitted by Bayview in support of its request for postpetition legal fees. Based on that review and the Court's familiarity with the proceedings between these parties, the Court concludes that the postpetition legal fees and costs incurred by Bayview in the amount of $249,049.90 are reasonable. To a significant degree, Bayview has incurred fees of this magnitude because of the Debtor's litigation choices. Putting that observation aside, the Court has independently examined the billing details supplied by Bayview and finds no basis to reduce the claimed fees due to unreasonableness. The Court therefore

---

[9] The Note executed by the Debtor (Maker) provides for Bayview (Holder) to collect attorney fees as follows:

> Maker shall pay all costs for collection of this Promissory Note, including reasonable attorneys' fees: (a) if this Promissory Note shall be referred after default to an attorney-at-law for collection or other appropriate action; (b) if an action of foreclosure shall be instituted after default on this Promissory Note; or (c) in connection with any enforcement or defense of this Promissory Note or any other document executed in connection with the execution of this Note in any action or proceeding brought by any person or entity, including Holder or Maker.

[Jt. Ex. A-1.]

concludes that, as of November 19, 2019, amount of the Allowed Secured Claim is $1,673,332.74.

Dated: December 20, 2019

Michael A. Fagone
United States Bankruptcy Judge
District of Maine